Case 1:17-cv-00956-JCH-LF   Document 1-1   Filed 09/18/17   Page 1 of 13

FILED IN MY OFFICE
DISTRICT COURT CLERK
8/16/2017 4:24:58 PM
James A. Noel
Latoya Grayes

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT

LON SEXTON,

    Plaintiff,

v.                                                      No.D-202-CV-2017-05955

CMH HOMES, INC.,
d/b/a CLAYTON HOMES, d/b/a OAKWOOD HOMES OF ALBUQUERQUE,
CMH MANUFACTURING, INC., and
VANDERBILT MORTGAGE AND FINANCE, INC.,

    Defendants.

## COMPLAINT AND JURY DEMAND

1. Defendants sold Plaintiff a severely defective manufactured home and then stood by as it developed a dangerous mold infestation. Plaintiff brings claims for damages, declaratory relief, and equitable relief.

### Parties

2. Plaintiff Lon Sexton lives in Aztec, New Mexico.

3. Mr. Sexton supports his family by working as a mechanic for a natural gas company in southwestern Colorado.

4. Defendant CMH Homes, Inc. ("CMH") is a Tennessee corporation that is registered to do business in New Mexico.

5. CMH operates a manufactured home dealership in Albuquerque under the name Oakwood Homes of Albuquerque ("Oakwood").

6. CMH is the parent company of Defendants CMH Manufacturing, Inc., and Vanderbilt Mortgage and Finance, Inc.

1                Exhibit A - Notice of Removal

7. Defendant CMH Manufacturing, Inc. ("CMH Manufacturing") is a Tennessee corporation that is not registered to do business in New Mexico.

8. CMH Manufacturing builds manufactured homes in its Sulphur Springs, Texas, factory.

9. Defendant Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt") is a Tennessee corporation that is registered to do business in New Mexico.

10. Vanderbilt provides financing for the purchase of manufactured homes.

11. Defendants work in concert as a joint enterprise and as agents of one another to build, sell, and finance manufactured homes. Consumers frequently do not realize that there are several separate business entities involved in their manufactured home transaction.

## Mr. Sexton Purchased a Manufactured Home

12. Mr. Sexton and his wife Heather Sexton needed a home for their family.

13. Mr. and Mrs. Sexton have five children, four of whom live at home.

14. Mr. and Mrs. Sexton went to CMH's Oakwood dealership to look into purchasing a manufactured home.

15. Mr. and Mrs. Sexton explained to Defendants that they needed a home for their family.

16. Over the course of several visits, Defendants showed Mr. Sexton, Mrs. Sexton, and their children several different models.

17. Mr. and Mrs. Sexton eventually focused on the "Absolute Value" model, manufactured by CMH Manufacturing ("the Home").

18. The Home was large enough to fit Mr. and Mrs. Sexton's family, and it was affordable to Mr. and Mrs. Sexton.

19. Defendants made numerous representations to Mr. and Mrs. Sexton concerning the features, quality, and condition of the Home.

20. Defendants represented that the Home would be of new quality and free from defects.

21. Defendants represented that the Home was completely covered by warranty and that Defendants would honor the warranty.

22. Defendants showed Mr. and Mrs. Sexton a model version of the Home, and provided written materials stating detailed specifications for the Home.

23. Defendants represented that the Home complied with state and federal manufactured home standards.

24. CMH represented that it would take responsibility for the delivery and set up of the Home, and that it would not release the keys to the Home until its service technician had thoroughly inspected the Home, including for water leaks.

25. Defendants omitted to inform Mr. and Mrs. Sexton about the poor quality of the Home, and about persistent problems with Defendants' manufactured homes, including water leaks resulting in mold infestations.

26. Defendants' representations were false, and its omissions were material to Mr. and Mrs. Sexton.

27. Based on Defendants' representations and material omissions, on April 14, 2016, Mr. and Mrs. Sexton decided to buy the Home.

28. Mr. and Mrs. Sexton would not have purchased the Home if they had known the truth about Defendants' misrepresentations and material omissions.

29. Mr. Sexton signed a Sales Agreement ("Sales Contract") and associated documents, in which he agreed to pay $88,110 for the Home, plus taxes and fees.

30. CMH and CMH Manufacturing, Inc. provided certain express warranties for the Home.

31. In addition, the implied warranties of merchantability and fitness for a particular purpose attached to the Home.

32. The promise to deliver and set up the Home triggered the implied warranties of reasonable skill and workmanlike manner.

33. New Mexico law imposes additional warranties on manufactured homes. N.M.A.C. §14.12.6.1 *et seq*.

34. Defendants also sold Mr. Sexton a "Home Service Contract" for an additional $699.

35. The Home Service Contract was provided by yet another CMH subsidiary, Homefirst Agency, Inc.

36. Defendants represented that the Home Service Contract would provide additional coverage for the home structure, systems, and appliances.

37. Because Mr. Sexton could not buy the Home with cash, Defendants arranged for Mr. Sexton to enter into a Consumer Loan Note and Security Agreement ("Loan Contract") with Vanderbilt.

38. The Loan Contract called for Mr. Sexton to make payments over the course of more than 20 years at an annual percentage rate exceeding 6%.

39. The Loan Contract stated as follows:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

40. Vanderbilt is the holder of the Loan Contract.

41. CMH agreed to deliver and set up the Home.

42. Over several days starting on or about June 6, 2016, CMH delivered and set up the Home on Mr. Sexton's property in Aztec, New Mexico.

43. The Home had been manufactured poorly with numerous defects, and the delivery and set up were not performed with reasonable skill and in a workmanlike manner.

44. Nevertheless, after set up was complete, CMH inspected the Home and represented to Mr. Sexton that it was in good condition.

45. CMH provided the keys, and in July of 2016, Mr. and Mrs. Sexton and their children moved into the Home.

### The Manufactured Home Is Severely Defective

46. Soon after moving in, Mr. Sexton noticed numerous defects in the Home, including water damage.

47. Mr. Sexton immediately notified Defendants of the defects, including his concerns about mold.

48. In September of 2016, Defendants sent several contractors to make repairs, including one contractor to repair the water leak.

49. It was immediately apparent that the repairs failed.

50. Again, Mr. Sexton informed Defendants of the defects, including the ongoing water leak.

51. After numerous delays by Defendants, another contractor visited the Home in December of 2016, and again failed to repair the water leak and the remaining problems.

52. Again, Mr. Sexton informed Defendants of the defects, including the ongoing water leak.

53. Defendants agreed to send representatives of CMH and CMH Manufacturing to inspect the Home.

54. After additional delays, in February of 2017, only Ken Wiegert, an employee of the Oakwood Homes of Albuquerque dealership, visited the Home.

55. Mr. Weigert acknowledged the need for numerous repairs to the Home.

56. However, Mr. Weigert would only agree to perform the repairs on the condition that Mr. Sexton sign a general release of all claims other than those listed.

57. Mr. Sexton refused.

58. Although Mr. Sexton did not sign the release, Defendants agreed to hire another contractor to repair the water damage.

## The Manufactured Home Developed Dangerous Mold

59. The contractor arrived at the Home to begin work in February of 2017.

60. Within a few minutes of starting the work, the contractor recognized the signs of a mold infestation.

61. The contractor stopped work immediately out of fear of injury to his workers and to Mr. and Mrs. Sexton's family.

62. Mr. Sexton insisted that Defendants test the Home for mold.

63. On February 18, 2017, Defendants arranged for sampling of the Home.

64. Pro-Lab, an accredited environmental microbiology laboratory, performed a mold analysis based on the samples.

65. The mold analysis revealed elevated levels of several types of mold, including stachybotrys, which is notoriously dangerous to humans.

66. In March of 2017, six months after Defendants were first informed about the water leaks, Defendants proposed that they hire a mold remediation company to make extensive repairs to the Home, including tearing out contaminated flooring and wall materials.

67. Mr. and Mrs. Sexton could not agree to allow yet another attempt at repairs. They were too concerned about the health of their family, and the Home was too severely damaged, permanently reducing its value.

68. Mr. Sexton suggested that Defendants take the Home back, and Defendants refused.

69. In addition to the mold infestation, the Home still has the following defects:

    a. Damaged roof / drip edge stains in closet;

    b. Faulty cabinet doors;

    c. Damaged flooring in kitchen;

    d. Door frames not square;

    e. Soft spots in floor in master bath;

    f. Walls curved in multiple spots;

    g. Carpet has bald spots;

    h. Faulty sink in second bath;

    i. Faulty kitchen sink;

    j. Short or bad motor on stove exhaust hood;

    k. Walls separated in kitchen and kids closet;

    l. Stains on ceiling in kids bedroom;

    m. End walls not painted to match home; and

    n. Multiple bad or stained wall panels throughout home.

70. Mr. and Mrs. Sexton found legal counsel, and on July 14, 2017, they notified Defendants in writing that they were revoking acceptance of the Home, a right provided to them by New Mexico law.

7

71. Mr. and Mrs. Sexton requested instructions concerning the return or disposition of the Home and other logistical matters relating to revocation.

72. Defendants ignored Mr. and Mrs. Sexton's letter, leaving them with no choice but to file this lawsuit.

73. Plaintiff was damaged by Defendants' misconduct, including impairment to the value of the home, failure to abide by Plaintiff's revocation of acceptance, numerous out-of-pocket expenses relating to the Home, aggravation, humiliation, frustration, and emotional distress, and other direct, incidental, and consequential damages.

74. Mr. and Mrs. Sexton and their children were exposed to potentially dangerous mold and ill health effects.

75. Damages to Mr. Sexton and his family are ongoing.

76. Defendants' conduct is part of a pattern of misconduct, justifying a substantial award of punitive damages.

## First Claim for Relief: Breach of Warranty

77. Defendants provided written, implied, and other legally-imposed warranties as to the Home, as set forth above.

78. Defendants breached their warranties.

79. Defendants' breach of warranty was malicious, reckless, wanton, oppressive, and fraudulent.

80. Plaintiff is entitled to actual and punitive damages.

## Second Claim for Relief: Revocation of Acceptance

81. As a result of Defendants' breaches of contract, the Home has numerous non-conformities that substantially impair its value.

82. Plaintiff is entitled to revoke acceptance of the Home, in addition to or in alternative to other remedies sought herein.

83. Plaintiff is entitled to damages and injunctive relief.

### Third Claim for Relief: Breach of Contract

84. Plaintiff and Defendants entered into agreements for the purchase, construction, delivery, and set up of the Home.

85. Defendants breached the contract, including by failing to provide the quality of home represented and by failing to honor their warranties after numerous defects were brought to their attention.

86. This breach of contract caused damages to Plaintiff.

87. Defendants' conduct was malicious, reckless, wanton, oppressive, and fraudulent.

88. Plaintiff is entitled to actual and punitive damages.

### Fourth Claim for Relief: Breach of Covenant of Good Faith and Fair Dealing

89. In the contract between Plaintiff and Defendants, there is an implied promise of good faith and fair dealing.

90. Defendants breached the implied covenant when, through their conduct, they withheld the contract's benefits from Plaintiff.

91. Defendants' conduct was wrongful, intentional, and in bad faith.

92. Plaintiff is entitled to actual and punitive damages.

### Fifth Claim for Relief: Violation of the Unfair Practices Act

93. The conduct described herein occurred in the regular course of Defendants' trade or commerce, and their actions are subject to the UPA.

94. This conduct constitutes unfair or deceptive trade practices, within the meaning of the UPA, N.M.S.A. 1978 §57-12-2(D).

95. This conduct also constitutes unconscionable trade practices, within the meaning of the UPA, N.M.S.A. 1978 §57-12-2(E).

96. Defendants willfully engaged in these unlawful trade practices.

97. As a result of these violations, Plaintiff is entitled to recover actual or statutory damages, trebled.

98. Plaintiff is also entitled to costs and attorney fees.

### Sixth Claim for Relief: Violation of the Manufactured Housing Act

99. The Home is a "manufactured home," Defendant CMH is a "dealer," and CMH Manufacturing is a "manufacturer," as defined by the MHA, N.M.S.A. 1978 §60-14-2, and the transactions described herein are subject to the MHA and its regulations, N.M.A.C. §14.12.1.1. *et seq*.

100. Defendants violated the MHA and its regulations by breaching their warranties; failing to take appropriate corrective action; misrepresenting and omitting material facts; engaging in false, misleading or deceptive advertising; and failing to comply with minimum construction and installation standards.

101. Violations of the MHA and its regulations are actionable as violations of the UPA. N.M.S.A. 1978 §60-14-19(C).

102. Defendants willfully engaged in the conduct constituting a violation of the MHA.

103. As a result of these violations, Plaintiff is entitled to recover actual and statutory damages, trebled.

104. Plaintiff is also entitled to costs and attorney fees.  N.M.S.A. 1978 §60-14-19(C).

### Seventh Claim for Relief: Fraud

105. Defendants induced Plaintiff to purchase the Home by misrepresentation of material facts and by omission of material facts, as set forth above.

106. Defendants knew such representations to be false, or they made those representations recklessly, or Defendants had no reasonable grounds for believing those representations were true. Defendants also knew that their omissions were material and important.

107. In the alternative, Defendants made negligent misrepresentations to Plaintiff.

108. Defendants intended to deceive Plaintiff and intended that he would rely upon their representations, which he did, to his detriment, suffering damages thereby.

109. Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith.

110. Plaintiff is entitled to actual and punitive damages.

### Eighth Claim for Relief: Negligence

111. Defendants owed a duty of care to Plaintiff in the construction, sale, transport, and set up, and repair of the Home.

112. Defendants breached their duty.

113. Plaintiff was caused damages thereby.

114. Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith.

115. Plaintiff is entitled to actual and punitive damages.

### Ninth Claim for Relief: Strict Products Liability

116. Defendants, as suppliers of manufactured homes, are liable for harm caused by an unreasonable risk of injury resulting from the condition of the Home.

117. Defendants' conduct fell well below the relevant standard of care.

118.    Plaintiff is among the class of people Defendants could reasonably expect to use the manufactured home.

119.    Defendants' product was defective in numerous ways and therefore, Defendants are liable for all damages occurring to Plaintiff as a result.

120.    Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith.

121.    Plaintiff is entitled to actual and punitive damages.

## Demand for Jury

122.    Plaintiff demands a trial by a jury of six person on all issues so triable, and deposits the requisite fee with the Clerk of the Court.

## Prayer for Relief

Wherefore, Plaintiff prays for the following relief:

A.  Actual damages;

B.  Treble damages pursuant to the UPA;

C.  Punitive damages;

D.  Equitable relief as necessary to effect Plaintiff's revocation of acceptance;

E.  Declaratory relief that Vanderbilt is liable for all damages awarded for Defendants' conduct, up to the amount payable under the contract;

F.  Attorney's fees and costs;

G.  Other relief deemed just.


Respectfully submitted,

 /s/Nicholas H. Mattison
Nicholas H. Mattison
Feferman, Warren & Mattison
300 Central Ave., SW, Suite 2000 West
Albuquerque, NM 87102

(505) 243-7773
(505) 243-6663 fax
nmattison@nmconsumerwarriors.com